Keating, J.
Petitioner-appellant Castaways is a business partnership of three men who operate a motel on land beside the Niagara River. In 1964 petitioner applied for a grant of land under the river adjacent to its property.
The circumstances which brought about this application were these. Castaways’ neighbor downstream was the La Salle Yacht Club. Some time in the early 1960’s, after the completion of the New York State Power Authority’s Niagara power project, the yacht club began to sustain costly winter ice damage to its docks and facilities and contemplated bringing an action against the New York State Power Authority to recover for such damage. To remedy the situation on a permanent basis, the yacht club asked the petitioner to agree to fill in the area of the proposed grant and to enclose such area in a sheet steel bulkhead. The benefit to the petitioner of this arrangement would be the additional land, while the advantage to the yacht club was the expectation that the filling of the area would serve as a breakwall and prevent, further damage to the yacht club’s facilities. Petitioner agreed to the plan and made the application but, because of the length of time required to process the application and the prospect of further damage during the following winter, the yacht club undertook to obtain the respondent’s consent for the project to proceed while the *123 application was pending. The necessary consent was obtained, and the petitioner thereafter expended some $50,000 in filling the area and enclosing it with the bulkhead.
Meanwhile, the application proceeded on its way through the various prescribed procedures. Subdivision 13 of section 75 of the Public Lands Law provides that, before any patent for any land grant under water could be issued, “the power authority of the state of New York shall * * * advise the commissioner in writing that such grant, if made, will not interfere with its St. Lawrence or Niagara project ”. Accordingly, the Office of General Services submitted the application to the New York State Power Authority.
On July 21,1965 the Office of General Services received a reply from the Authority which stated that at a meeting of the Authority held on July 19, 1965 a resolution was adopted which stated that the Castaways’ project “ will not interfere with the Authority’s St. Lawrence or Niagara project ”. The resolution, however, made the approval contingent upon the applicant’s signing of a covenant of release which would ‘ ‘ forever release the State of New York and the Authority from any claims * * * occasioned at any time ’ ’.
Meanwhile, petitioner proceeded to carry out other necessary, required steps including the giving of notice to other interested parties. By October of 1966, the only remaining item to be done, cr so it appeared to petitioner, was the payment of the approximately $18,000 as a consideration.
On October 20,1966 the petitioner received the following letter which, in pertinent part, stated: “ Enclosed is an original and one copy of a covenant requested by the Power Authority of the State of New York with respect to the patent that we are issuing to Castaways Motel. Would you kindly execute the original copy and return it to us.”
This Was the first occasion on which it was in any way indicated to petitioner that any such release would be required. Immediately upon receiving the letter petitioner consulted counsel who wrote a letter to the Chief of the Bureau of Surplus Beal Property. In it, counsel noted that the release would apply not only to past damages, but to all future claims as well. While he was willing to advise his client to sign a release with respect to any damage which may have been occasioned in the *124 past, he would not advise -him “ to give a carte blanche release from whatever the State -or Power Authority may do in the future ’ ’. He then went on to state that, if the release could be redrafted to indicate a release from any damage which may have occurred “ from the beginning of the world to this date ”, he could see nothing objectionable. In an answering letter, petitioner’s counsel was informed that the grant was explicitly conditioned upon the acceptance of the covenant by Castaways. The letter also indicated that, unless petitioner signed the grant, the Commissioner had no power to issue the grant, but that, if the Authority were willing to waive the condition, the respondent would be “ happy to do so ”.
Within four months of the receipt of the second letter, but not within four months of the first, petitioner commenced this article 78 proceeding to compel respondent to make the grant without the condition imposed by the Authority. Respondent moved to dismiss the proceeding on the -ground that it was not commenced within the time provided by CPLR 217 and that the petition failed to set forth a right to any relief.
Special Term dismissed the petition stating that the letter of October 20, 1966 constituted the “final and binding determination”' referred to in CPLR 217. The Appellate Division unanimously affirmed. It agreed with petitioner’s contention that the condition imposed by the Authority was unlawful and also unreasonable and arbitrary. The court noted that there was nothing in the legislative history of the section which would indicate that the statute intended to permit the Authority to secure releases for future damages or impose other collateral conditions in order to obtain its consent. The determination which the law requires is solely a factual one, whether the proposed grant would lead to a possible interference with the hydroelectric projects which the Authority operated.
The ground upon which the Appellate Division affirmed was that the Authority was a necessary party to the action. The reasoning for this conclusion was that under -section 75, if the Authority advises in writing a grant will interfere, the Commissioner of General Services has no discretion and must deny the application. Only if the advice that there would be no interference is given, can the Commissioner issue the grant. If relief were here granted -petitioner, it would in fact constitute *125 a finding of noninterference and, therefore, the Power Authority might be affected by the ultimate decision. The court then noted that, since more than four months had passed, it was no longer possible to bring the Authority in as a party, and the relief sought must be- denied.
We granted leave (22 N Y 2d 643). On the appeal here, respondent no longer contends that the condition imposed was authorized by law. Instead, reliance is placed upon the two procedural grounds urged.
We do not agree that the Authority is a necessary party. The conclusion reached below goes squarely against the general policy of the Civil Practice Law and Rules to limit the scope of indispensable parties to those cases and only those cases where the determination of the court will adversely affect the rights of non-parties (2 Weinstein-Korn-Miller, N. Y. Civ. Prac., If 1001.01), although “ [I]n large measure the eases on necessary parties are explicable on the ground of substantive rather than procedural theory and no general procedural principle subsumes them.” (2 Weinstein-Korn-Miller, supra, If 1001.06.)
In the circumstances of this case, the Authority is not a necessary party. Having reached the conclusion from an engineering point of view that the petitioner’s plan would not interfere with its project, the Authority had no basis for denying its consent. To see the issue more sharply, one need only assume what would have occurred, had the petitioner made the Authority a -party to this proceeding. The condition which the Authority had imposed would have been invalidated. For the Authority to have then refused to give the consent required by the section would -have been nothing less than an attempt to subvert the decision of the Appellate Division invalidating the requirement.
The release -could not conceivably -alter the flow of the waters of the Niagara River or interfere with the operation of the Power project. It is, therefore, evident that the Power Authority’s interest, although affected, is nonetheless not affected 1 ‘ inequitably ’ ’ within the meaning of CPLR 1001 since, under the peculiar circumstances here, the Authority could have made no other determination than to give its consent.
Respondent’s second contention is that this proceeding was not timely commenced. Section 75 of the Public Lands Law, *126 dealing with grants of land under water, provides in subdivision 7 that grants may be made 11 to promote.the commerce of this state or for the purpose of beneficial enjoyment thereof by such owners, or for agricultural purposes, or for public park, beach, street, highway, parkway, playground, recreation or conservations purposes ”.
It would appear that the decision to be made by the Commissioner of General Services is a discretionary one and, after he receives the advice of the Authority, he must still determine whether the project would be in accord with one or more of the statutory purposes. Consequently, the argument of the petitioner that the proceeding here was in the nature of mandamus cannot be accepted.
Nevertheless, the letter of October 20, 1966 was not 'a “ final and.'binding ” determination within the meaning of CPLR 217. The letter is certainly 'ambiguous on the point. It speaks of the .-“covenant requested” by the Authority and refers to the “patent that we are issuing ” to petitioner. If there was anything final in the letter, it was that the patent was being granted. The “final and binding determination” here ran from the date of the second letter where for the first time it was explicitly stated that the signing of the release was a prerequisite for the granting of the patent.
The drafters of the Civil Practice Law and Rules, when considering various amendments to the Civil Practice Act dealing with Statutes of Limitation, had as one of their proposals before them a provision which would have stated that the statute should begin to run when there had been a- demand and an “ express or implied ” refusal (8 Weinstein-Korn-Miller, N. Y. Civ. P'rae., 1Í 7804.02). This provision was rejected, however, for the very reason that it imposed an unfair burden on the attorney and on the public to determine when an implied refusal had occurred. In drafting the section which is now the law, every attempt was made to avoid putting a party or his counsel in a position of having to guess when a ‘ ‘ final and binding ’ ’ determination had been made. The burden was put on the public body to make it clear what was or what was not its determination. In dealing with this dilatory defense the courts should resolve any ambiguity created by the public body against *127 it in order to reach a determination on the merits and not deny a party his day in court.
Accordingly, the order of the Appellate Division should he reversed, with costs, and the petition should he reinstated.
Chief Judge Fuld and Judges Burke, Scileppi, Bergan, Breitel and Jasen concur.
Order reversed, with costs, and matter remitted to Special Term for further proceedings in accordance with the opinion herein.