■ In the Matter of NEW YORK EXCESS AND SURPLUS LINES ASSOCIATION, LTD., Appellant, v ALBERT B. LEWIS, as Superintendent of Insurance of the State of New York, et al., Respondents. — Order, Supreme Court, New York County (Fingerhood, J.), entered April 8, 1982 which granted reargument and adhered to a prior determination dismissing petitioner's CPLR article 78 application on the ground that it was not timely commenced, modified, on the law, without costs, to the extent of denying respondents' motion to dismiss the petition, and otherwise affirmed. Petitioner's appeal from the judgment entered February 4, 1982 is dismissed, without costs, as superseded by the later order. Petitioner is a nonprofit corporation organized under the laws of this State, consisting of members who are excess line insurance brokers licensed to act as such pursuant to section 122 of the Insurance Law, which permits the licensees to procure insurance from insurers that are not authorized to transact business in this State. Subdivision 1 of the section establishes a standard of "due care" in the selection of unauthorized insurers. Subdivision 6 requires that licensees use "diligent effort" to procure insurance from an authorized insurer in the amount required to protect the insured before turning to an unauthorized insurer for such coverage, procure coverage from an unauthorized insurer only in an amount which is excess over the amount procurable from authorized insurers, and file statements attesting, under the penalties of perjury, that the aforesaid standards have been met. On August 23, 1962 the Superintendent of Insurance promulgated regulation 41, which established procedures deemed essential to meet the general standards of due care and diligent effort set forth in the Insurance Law. The regulation was sustained in *Matter of B. & R. Excess Corp. v Thacher* (37 Misc 2d 307, affd 18 AD2d 1137). On November 25, 1980 the superintendent promulgated revised regulation 41 (11 NYCRR Part 27) which provides, in section 27.3 (a), that an excess line broker may not procure insurance from an unauthorized insurer unless the risk was first rejected by five authorized insurers, and that proof of such rejection must be made by the excess line broker. Section 27.3 (b) provides that there shall be declination forms which "shall be in a form enumerated EL-2, as approved by the superintendent. This EL-2 form shall be a two-part form, the original of which is to be forwarded to the person on behalf of the company making the declination, and the second part of which shall be retained by the broker or excess line broker." A proposed form EL-2 was included in the November 25, 1980 press release that announced the amended regulation. The proposed form carried an instruction that it was to be completed by the excess line broker and signed and dated by the company representative. However, the wording of the form itself indicated that it was to be filled out by the agent or underwriter having underwriting authority for the authorized insurance company that declined the risk. Significantly, the proposed form required the person filling it out to set forth the *reason* for declining the risk, a requirement not contained in the regulation itself. On December 12, 1980 petitioner's president wrote to the deputy superintendent inquiring as to the effective date of regulation 41 as amended, and also asking, with some urgency, when the EL-2 form would be released, citing hundreds of inquiries by petitioner's members. On January 22, 1981 the *Journal of Commerce* carried an article headlined "N.Y. Delays

Redesign of Reg. 41 Forms." It was reported in this article that the chief of the Insurance Department's Consumer Services Bureau had stated that he was unable to predict when the new forms would be ready, and that the department had been consulting with alien insurers as to the forms with the intention of being "as responsive as possible" to their needs and concerns. On February 23, 1981 the superintendent released a circular letter containing the final EL-2 form to be completed by the excess line brokers. While the information required to be filled out was substantially identical to that contained in the proposed form, the language was modified to establish, for the first time, that the excess line broker had to set forth the reason for declining the risk as related to him by each of the authorized insurers that had declined the risk. On May 15, 1981 petitioner instituted an article 78 proceeding seeking to annul regulation 41 and the EL-2 procedure on various grounds. The superintendent moved to dismiss the petition, alleging that it was untimely commenced under CPLR 217 which provides, insofar as relevant here, that "a proceeding against a body or officer must be commenced within four months after the determination to be reviewed becomes final and binding upon the petitioner". The critical issue is whether the statutory period commenced running on November 25, 1980, the date regulation 41 was promulgated, or on February 23, 1981, the date the EL-2 form designed to carry out the regulation was finally adopted. Special Term granted the motion to dismiss and adhered to that decision on reargument in a thoughtful opinion which concluded that the ultimately adopted form "was merely incidental" here, as was held to be the case in *Matter of Allstate Ins. Co. v Stewart* (36 AD2d 811, affd 29 NY2d 925). Recognizing that the question presented is a close one, we disagree, find that the applicable statutory period commenced running on the date the form was adopted, and accordingly modify to the extent of denying the motion to dismiss the petition. As ultimately adopted, the EL-2 form required the excess line brokers to report the reasons given by the underwriters for declining the risk and further required the declining underwriter to confirm the accuracy of that information. Regulation 41 itself included no requirement that the reasons for the declination be set forth. On the face of it, this requirement in the adopted forms represented a material addition to the regulation. In short, it was not until the form was adopted that "petitioners had a final determination from which to ascertain the possible consequences, as to them" of the regulation. (See *Matter of Martin v Ronan*, 44 NY2d 374, 381.) It does not seem to us a convincing answer to this analysis that the proposed EL-2 form issued together with the promulgated regulation on November 25, 1980 also included a requirement, albeit in a somewhat different manner, for the reporting of the reason given for declination. The article in the *Journal of Commerce* referred to above made clear that the Superintendent of Insurance was deferring adoption of a final EL-2 form pending consultation with alien insurers with a view to being responsive to their needs and concerns. From this the petitioner could reasonably have concluded that the one significant feature of the proposed form not embodied in the regulation might ultimately be deleted, that requirement clearly being one of concern to the alien insurers and the most obvious manner in which the form might be revised to be responsive to their concerns. In *Matter of Castaways Motel v Schuyler* (24 NY2d 120, 126-127), the Court of Appeals stated, with regard to a Statute of Limitations defense asserted by a public body or officer: "The burden was put on the public body to make it clear what was or what was not its determination. In dealing with this dilatory defense the courts should resolve any ambiguity created by the public body against it in order to reach a determination on the merits and not deny a party his day in court." The principle set forth in *Castaways* seems to us controlling here. The

revision and approval of the final EL-2 form was not "merely incidental" to the promulgated regulation 41 in the particular circumstances presented herein. Accordingly, the motion to dismiss should have been denied. Respondents are directed to serve an answer within 20 days after the entry of this court's order. Concur — Sandler, J. P., Sullivan and Milonas, JJ. Asch and Alexander, JJ., each dissent in a separate memorandum.

Asch, J. (dissenting). The petitioner is an organization of excess life insurance brokers engaged in the business of procuring policies of insurance from insurers who are not licensed to transact business here. The volume of insurance procured by these brokers runs into the hundreds of millions of dollars. They are sophisticated both in their own fields and in their relationship with the Insurance Department. Essentially, their position in the matter before us is that they were misled by alleged statements of the Superintendent of Insurance or his representatives into thinking that the promulgation of a regulation which mandated the use of a certain form, was not final. They claim, further, that as a result of this mistaken belief they were lulled into not taking any action within four months of November 25, 1980, when revised regulation 41 became effective. In actuality, the regulation was never changed nor, in any significant aspect, was the form. The industry was clearly put on notice, that as of the effective date, brokers placing excess insurance would have to submit multiple forms establishing that five carriers licensed in New York were unwilling to assume the risk and hence resort to unlicensed carriers was necessary. On the effective date of regulation 41, the Department of Insurance published a proposed form, and on February 23, 1981, the official form EL-2 was published. The two forms are virtually identical. They certainly both imposed a requirement that where a licensed carrier rejects the risk, it would have to sign the form. There was never any suggestion by the superintendent that this requirement would be eliminated. The superintendent's press release issued on November 25, 1980, the date of the promulgation of the revised regulation, stated that: "The broker who places the excess * * * insurance must identify in writing, the New York admitted carriers who declined the risk. In addition, the representatives of the admitted carriers who, in fact, declined the * * * risk must corroborate the statement of the broker". In addition, when the revised regulation was released on November 25, the regulation contained, as noted *supra*, a proposed copy of the EL-2 form. Further, section 27.3 of the revised regulation 41 (11 NYCRR 27.3) required that excess line brokers *and* the insurers declining to offer coverage must verify and confirm such declaration in precisely the manner provided in EL-2. When the Superintendent of Insurance adopted an assigned risk automobile insurance plan in a letter dated November 26, 1969, the plan was subject to the approval of certain forms which were to be submitted before the effective date of the plan on December 22. In a proceeding brought to challenge that plan, this court found that the four-month Statute of Limitations commenced on the earlier of two dates and that the forms were merely incidental to the assigned risk plan (*Matter of Allstate Ins. Co. v Stewart*, 36 AD2d 811). Similarly, in the instant matter, the issuance of the form was merely incidental to the revised regulation 41. We note that even if the instant action is construed as one for declaratory judgment, the four-month limitation would apply. (*Solnick v Whalen*, 49 NY2d 224, 229-230.) Accordingly, the order of Special Term, New York County (Fingerhood, J.), entered on April 8, 1982, which granted reargument and, upon reargument, adhered to the prior determination dismissing petitioner's application on the ground that it was not timely commenced, should be affirmed. The judgment entered on February 4, 1982 should also be affirmed.

Alexander, J. (dissenting). At the heart of the petitioner's complaint is the contention that the date on which regulation 41 and the new EL-2 procedure became effective and was thus "known to have its detrimental effect" upon the members of the petitioner's organization was February 23, 1981, when the Insurance Department released circular letter number 5, which contained the revised form EL-2. The ability to establish that date, February 23, 1981, as the effective date will salvage this case from the time-barring effect of the four-month Statute of Limitations. Petitioner's contention on this appeal that regulation 41 and the EL-2 procedure only became effective on February 23 is at odds with the allegation in paragraph 6 of the petition herein which alleges that revised regulation 41 was promulgated and issued "to be effective on November 25, 1980". The real objection raised in the petition to regulation 41 is that it required that the risk sought to be covered be submitted to and rejected by five unaffiliated authorized brokers with a confirmation by those brokers that they had rejected the offered coverage. Indeed, the news release of November 25, 1980, which accompanied the promulgation of regulation 41 announced that "the broker who places the excess and surplus lines insurance must identify in writing, the New York admitted carriers who declined the risks. In addition, the representatives of the admitted carriers who, in fact, declined the proposed risk must corroborate the statement of the broker". This provision is in implementation of subdivisions (a), (b) and (c) of section 27.3 of regulation 41 (11 NYCRR Part 27). The form EL-2 initially issued with regulation 41, provided that it must be completed "by the submitting broker or Excess Line broker and signed and dated by the company representative". The form further provided for the company representative, that is the underwriter or agent, to confirm that he declined coverage and *to state the reason*. The revised form promulgated on February 23, 1981, is to be completed "by the submitting broker or excess line broker and signed and dated by the company representative". It, too, requires the submitting broker or excess line broker *to state the reason* the risk was declined by the particular company with the underwriter or agent merely confirming that the statement made by the broker is correct. Thus it is seen that both forms required a statement of the reason for the declination of the proffered coverage. The only significant difference between the two forms is that the form initially promulgated was to be completed but not signed by the submitting or excess line broker, and signed and dated by the company representative, while the form promulgated on February 23, was to be completed by the submitting or excess line broker and signed by him as well as signed and dated by the company representative. Since both forms required a statement of the reason for the declination of coverage, it is difficult to see how the fact that "the regulation itself makes no reference to requiring the reasons given by the Underwriters for declining coverage" is of any consequence in respect to when the regulation became effective, or how the sophisticated members of the industry were in any way misled by the news release cited by the majority. That the members of the industry may have harbored some hope of a later revision of the form is not a sufficient basis upon which to ground the contention that the regulation did not become effective at the time of its promulgation in November, 1980. Nor is the fact that the superintendent may not have intended to *enforce* the regulation until a later date a basis for holding that the *effective* date should be postponed. That petitioners were fully aware of the *effective* date of the regulation is seen from a reading of a letter of the president of the association written to the Deputy Superintendent of Insurance on December 12, 1980. It contains the following statement: "While I am of the understanding that the Regulation is effective *now,* is it your opinion that the New York State

Insurance Department will not enforce said Regulation until a future date? * * * I need your opinion * * * as to the date the Insurance Department will begin enforcing the Regulation. I am hopeful that your answer will be March 1st, 1981 at the very earliest." (Emphasis added.) The conclusion is inescapable that the argument relating to alleged confusion as to the form and the fact that in its news release, the department indicated that it was awaiting comment by alien insurers in respect to that form is an afterthought advanced to avoid the bar of the Statute of Limitations.