[863 NYS2d 154]

MHR Capital Partners LP et al., Appellants, v Presstek, Inc., Respondent, et al., Defendant.

First Department, August 5, 2008

## APPEARANCES OF COUNSEL

*Kasowitz, Benson, Torres & Friedman LLP*, New York City (*Michael P. Bowen, Michael M. Fay, David S. Rosner* and *Kim Conroy* of counsel), for appellants.

*Hartman & Craven LLP*, New York City (*Victor M. Metsch* and *Colleen D. Dalton* of counsel), for respondent.

## OPINION OF THE COURT

BUCKLEY, J.

In 2003, defendant Presstek and its wholly owned subsidiary, defendant Silver Acquisitions Corp. (Silver), began to explore the possibility of purchasing A.B. Dick Company (ABD) from its parent, Paragon Corporate Holdings, Inc. (Paragon). Those entities negotiated a Stock Purchase Agreement, which incorporated ancillary agreements, including one whereby plaintiffs, MHR Capital Partners LP and its affiliates (collectively, MHR), major creditors of ABD, waived rights they held under ABD notes in return for payment of cash and Presstek stock.

On June 16, 2004, Presstek, Silver, ABD, Paragon, and MHR executed an Escrow Agreement, pursuant to which the Stock Purchase Agreement was deposited in escrow, to be released upon the satisfaction of certain conditions by specified dates; if the conditions were not met by their expiration dates, then the escrowed documents were to be destroyed. Among the express conditions was the requirement that Key Corporate Capital, Inc. (Key Bank), ABD's lender, sign the consent form attached to the Escrow Agreement by the close of business on June 22, 2004. A "WHEREAS" clause recited that the parties had agreed to hold the documents in escrow for a "four (4) day period (the 'Key Escrow Period') to obtain the consent of Key . . . to the Proposed Transaction." Another "WHEREAS" clause stated that the parties had "agreed that the escrow provided for hereunder shall in no event be released unless and until Key consents to the transaction on the terms and conditions

contained herein." Section 3 (b) of the Escrow Agreement provided:

> "From the date hereof through the close of business on June 22, 2004, [Paragon] shall endeavor to obtain Key's consent and agreement to the Proposed Transaction, such consent and agreement to be evidenced by Key's execution of [the consent and agreement] attached hereto."

Section 4 (b) stated:

> "On or prior to the expiration of the Key Escrow Period, if Key shall have consented to the transaction *and executed the Consent and Agreement in accordance with Section 3 (b) above,* then, subject to the completion of 3 (a) above [outlining other requirements], the parties hereby agree that the Escrow Deposit shall be released from any condition relating to obtaining Key's consent" (emphasis added).

Section 4 (c) continued:

> "Upon the earlier of (i) the failure of the occurrence of the items set forth in Section 4 (a) or 4 (b) above . . . or (iii) the expiration of the Key Escrow Period without receiving the consent and agreement of Key, [Presstek] shall . . . destroy all of the [escrowed documents]."

Finally, section 7 set forth:

> "This Escrow Agreement may not be altered or modified without the express prior written consent of the Parties hereto. No course of conduct shall constitute a waiver of any terms or conditions of this Escrow Agreement, unless such waiver is specified in writing, and then only to the extent so specified."

It is uncontested that Key Bank did not execute the consent form by the close of business on June 22, 2004. Moreover, it is uncontroverted that Key Bank never signed the consent form. In fact, a Key Bank senior vice-president, Michael Lugli, testified at his deposition that Key Bank "would not sign it" because the bank "would not accept" certain of the conditions set forth in the consent form. Among the provisions that Key Bank objected to were that it provide unlimited funding to ABD through the closing of the sale (section 3 [a] of the consent

form), forbear from declaring any loan default until the closing of the sale (section 3 [b] of the consent form), and accept payment in the form of cash and Presstek stock (section 2 [a] of the consent form) rather than only cash. Fundamentally, Key Bank was "not willing to undertake the risk" of "an unconditional commitment to fund" ABD. Key Bank was willing to agree to a more limited commitment, and by letter dated June 22, 2004, signed by Lugli, agreed to lend up to $26 million "between now and the closing of the transaction . . . on or about July 16, 2004."

As the foregoing makes clear, there is no question that Key Bank did not sign the consent form, by the cutoff date or ever, and that Key Bank refused to agree to several substantive provisions of the consent form. Thus, by the terms of the Escrow Agreement, Presstek was relieved of any obligation to proceed to closing under the Stock Purchase Agreement.

MHR's assertion that Key Bank's signing of the consent form was not a condition precedent to the release of the Stock Purchase Agreement from escrow is belied by the plain language of the Escrow Agreement. Insofar as MHR contends that Key Bank's signature was a mere formality, Lugli confirmed at his deposition that the bank objected to the substance of certain requirements contained in the consent form. With respect to MHR's argument that the consent form was poorly worded or created conditions additional to those set forth in the Escrow Agreement or Stock Purchase Agreement, it should have voiced those concerns at the time the documents were drafted and agreed to by the parties. While MHR faults Presstek for not using more strenuous efforts to convince Key Bank to agree to the consent form, the Escrow Agreement placed that duty on Paragon.

Because there are no factual issues concerning the termination of the parties' agreements, summary judgment was properly granted to Presstek. Inasmuch as we are affirming the dismissal of the action, we need not discuss the alternative grounds for dismissal invoked by Presstek.

Accordingly, the judgment of the Supreme Court, New York County (Richard B. Lowe, III, J.), entered August 3, 2007, dismissing the complaint as against defendant Presstek, should be affirmed, without costs. The appeal from the order, same court and Justice, entered July 26, 2007, which granted Presstek's motion for summary judgment, should be dismissed, without costs, as subsumed in the appeal from the judgment.

ACOSTA, J. (dissenting in part). In my opinion, there are material issues of fact related to Presstek's conduct indicating that it attempted to frustrate or prevent the signing of the consent form.

Plaintiffs (MHR) allege that defendant Presstek breached its obligations under a June 16, 2004 Escrow Agreement and Stock Purchase Agreement of the same date to purchase the equity of a now-bankrupt graphic arts and printing supplier known as A.B. Dick Company (ABD) from its parent, Paragon Corporate Holdings. MHR was a significant creditor of ABD, once holding over $18 million in notes issued to ABD, which stood to have some of its debt cleared as an expressed beneficiary pursuant to the Stock Purchase Agreement.

Presstek and defendant Silver Acquisitions were involved in the graphic arts and imaging industries.* In 2004, Presstek and Silver were interested in purchasing ABD and proposed an agreement by which one or more of the MHR entities would receive fees and other reimbursements. Specifically, pursuant to the Distribution Agreement, incorporated into the Stock Purchase Agreement, MHR agreed to waive rights it held under its ABD notes and terminate the obligations owed to MHR by ABD and Paragon under the notes. In return, Presstek agreed to payments of cash and Presstek stock to MHR.

ABD, Paragon, MHR, Presstek and Silver entered into an Escrow Agreement, pursuant to which the parties deposited in escrow the Stock Purchase Agreement. Certain specified conditions were set forth for the release of the Stock Purchase Agreement, including the express requirement that Key Bank sign a consent to the transaction in a form annexed to the Escrow Agreement. The Escrow Agreement further provided that Key Bank's consent, evidenced by execution of the form annexed thereto, was required by the close of business on June 22, 2004, and if such consent was not received by the close of the expiration period, the escrowed documents were to be destroyed.

According to Michael V. Lugli, a senior vice-president of Key Bank, he met with Presstek's representatives on June 17, 2004, one day after the escrowing of the Stock Purchase Agreement. Presstek had asked for the meeting, and ABD and Paragon "greatly encouraged" Key Bank to meet with Presstek. During the meeting, Presstek requested that Key Bank continue to

---

* The complaint against Silver was dismissed for lack of personal jurisdiction.

provide funding to ABD for 30 days so that a closing could occur on the Stock Purchase Agreement. Lugli testified at his deposition that Presstek never mentioned the consent agreement nor told Lugli that it had to be signed by Key Bank during the meeting.

Although Key Bank initially declined to provide the requested funding at the June 17th meeting, on June 22, in response to a letter faxed from Presstek at 4:00 P.M. that day, Key Bank faxed back its agreement to do so later that afternoon, at 5:10 P.M. It should be noted that Presstek's letter to Key Bank did not specifically mention the consent agreement. Rather, it mentioned "relevant documents," Presstek's inability to proceed with the transaction without Key Bank's funding, and its conclusion that Key Bank had denied approval of the proposed transaction.

In its response to Presstek, Key Bank stated

> "[*Key Bank] hereby consents*, on behalf of itself as Agent, LC Issuer and as the sole Bank under its Credit and Security Agreement with Paragon Corporate Holdings, Inc., *to the Proposed Transaction pursuant to the terms that have been outlined to* [Key Bank]. Specifically, [Key Bank] understands that (a) the limited open due diligence conditions will have been satisfied on or before June 28th 2004, (b) Platinum will consent to any increase in the outstandings under [Key Bank] facility (up to $26,000,000) between now and the closing of the transaction, and (c) that there will be no other impediment to a closing on or about July 16, 2004" (emphasis added).

The letter was signed by Lugli on behalf of Key Bank.

That same evening, Presstek terminated the transaction by e-mail because of Key Bank's failure to sign the consent agreement. Lugli wrote to Presstek on June 25, 2004, stating that

> "Contrary to the analysis and the conclusions set forth in the June 22 Email, we believe that Presstek has repudiated its obligations with respect to the Proposed Transaction. The June 22 Email makes it clear that, notwithstanding our consent and the provisions of the Escrow Agreement and the Principal Documents, Presstek has no intention of proceeding with the Proposed Transaction. Presstek's actions since June 22 serve only to confirm the view—we

understand that Presstek . . . is attempting to negotiate with Paragon a new agreement for the purchase of [ABD] assets with a revised structure and a greatly reduced purchase price."

In fact, just one day after Presstek's termination of the Escrow and Stock Purchase Agreements, Presstek had drafted a term sheet for a significantly cheaper purchase of ABD's assets. According to plaintiff's statement of additional material facts, Presstek's CEO informed Presstek's board, one week after the termination, that the new Asset Purchase Agreement was structured so that "[m]any liabilities are 'left behind' " (including Presstek's obligations to MHR), and that the "new transaction is about $40 million less than the previous transaction."

Given ABD's dire financial condition, it went along with the Asset Purchase Agreement, and as required, filed for bankruptcy on July 13, 2004 in the District of Delaware. ABD and Paragon applied to the Bankruptcy Court for an order authorizing the sale of substantially all of ABD's assets to Silver and Presstek pursuant to a so-called "stalking horse auction" wherein third parties were invited to top their purchase proposal. On August 9, 2004, the MHR entities filed objections to the auction sale of ABD's assets on the ground that, inter alia, Silver and Presstek were not "good faith purchaser[s]" within the meaning of 11 USC § 363. Following document production, deposition and written submissions, an evidentiary hearing was held on MHR's objections. During closing arguments, counsel for MHR argued that MHR opposed the sale because Presstek could not establish it had acted "in good faith and that means without fraud, without evidence of collusion, without taking unfair advantage of bidders, and with integrity and honesty of purpose." Counsel went on to discuss MHR's breach of contract claim against Presstek in the context of its argument that Presstek failed to act in good faith within the meaning of 11 USC § 363.

In response, the court stated, "Well, what if I—in order of approving the sale, what if I assign that claim to [MHR] and let you proceed against Presstek?" MHR, through counsel, accepted the court's offer.

Counsel for Presstek argued that Presstek had acted in good faith within the meaning of 11 USC § 363 because the auction itself was fair. With respect to MHR's breach of contract claim, Presstek noted for the record:

"*I heard MHR's counsel say, not for the first time,*

*they're going to sue my client. That's never happy news for a client, but we understand that and we're prepared to take that fight on as and when we get there. But that's not the issue here today. The issue for today is not the alleged wrongful termination. You don't have a record on that. Your issue today is whether to approve this asset Purchase agreement.* And here the evidence is quite clear and, again, despite the attempts to muddy the record, the evidence was uncontrovert[ed]. There was a full and fair auction and no other bidders showed up. . . . There is absolutely nothing that suggests bad faith in the conduct of this auction. . . .

"It is our contention, of course, that my client did nothing whatsoever improper about the termination. But that's not really the issue. The issue respectfully is whether there's a business purpose here, and we believe the record of the Debtor's continuing losses and the fact that there is no realistic alternative here, fully supports the Debtor's business judgment that a sale of their assets is the only realistic answer here." (Emphasis added.)

In discussing the draft order that the Bankruptcy Court would issue after the hearing, the court stated, "you better put a provision in there . . . [about the] proposed litigation against Presstek for a violation, or what they allege to be a cause of action for violating the Stock Purchase Agreement, will be assigned to MHR." Presstek, however, objected to the Bankruptcy Court assigning the breach of contract claim to MHR, arguing that it was "part of the bargain for [sic] consideration that we have from the estate." The court noted that Presstek had earlier suggested it would defend itself against Stock Purchase Agreement-related claims.

Ultimately, the Bankruptcy Court did not make any findings regarding the merits of MHR's claim against Presstek for termination of the Stock Purchase Agreement. Instead, the court directed the parties to negotiate an order for the court's signature. The order did not address any issues related to the Escrow Agreement or Stock Purchase Agreement and, in fact, did not even mention those documents. Rather, the order addressed whether Presstek or Silver had engaged in any conduct that would cause or permit the Asset Purchase Agreement to be avoided under section 363 (n) of the Bankruptcy Code. Although

the order approved the sale, holding that all of MHR's objections were either resolved or overruled, it expressly preserved any of MHR's claims alleging Presstek's breach of the Escrow Agreement or Stock Purchase Agreement:

> "Notwithstanding any provision in this Plan or the Confirmation Order to the contrary, but subject to the terms of the Presstek Settlement Agreement and Presstek Settlement Order, nothing herein or in the Confirmation Order shall constitute a waiver, release or otherwise negatively impact or impair any claim, right, or cause of action that MHR or MHR Fund may hold against Presstek, Inc. and its subsidiaries, and affiliates, including its officers, directors, employees and legal and financial advisors; *provided however*, nothing herein shall revive any claim released pursuant to the Presstek Settlement Order, as amended, or the Presstek Settlement Agreement."

MHR appealed to the United States District Court for the District of Delaware but did not seek a stay of the implementation of the order. After a hearing on Presstek's motion to dismiss the appeal as moot because MHR failed to seek a stay, the court granted the motion. In addressing MHR's argument regarding "good faith," the court noted that prebankruptcy petition conduct was relevant to a section 363 (m) good faith finding only if that conduct actually impeded the auction process. *In re Abbotts Dairies of Pa., Inc.* (788 F2d 143 [3d Cir 1986]), relied upon by MHR, "speaks expressly to a corrupting of the process by collusion and fraud in the way the auction process is developed and there is nothing remotely like that in this case." In the end, as a result of ABD's bankruptcy, MHR received only $175,000 for its ABD notes.

MHR commenced the instant action in New York County Supreme Court against Presstek and Silver alleging breach of the Stock Purchase and Escrow Agreements. Paragraphs 9 through 25 of the complaint were substantially the same as paragraphs 7 through 20 of MHR's supplemental objections in the bankruptcy proceeding. The supplemental objections also charged Presstek with breach of the Escrow Agreement and Stock Purchase Agreement.

Presstek moved for summary judgment on various grounds, including that MHR was collaterally estopped and barred by res judicata because the claims asserted in the complaint had been

asserted and determined in the prior court proceedings. By order entered July 26, 2007, the court granted the motion and dismissed the complaint on the grounds of res judicata and collateral estoppel, and upon reargument, the court adhered to its initial decision. Although I agree with the majority that plaintiffs' breach of contract claim was neither collaterally estopped nor barred by res judicata by the bankruptcy proceeding, I respectfully disagree with its holding that the complaint should be dismissed in any event.

According to the majority, there is no breach of contract claim because Key Bank failed to sign the consent form as required by the escrow agreement. I disagree because in my opinion there are material issues of fact related to Presstek's conduct that prevent summary dismissal of the breach of contract claim. Initially, it should be noted that Lugli, who was negotiating on behalf of Key Bank, testified that when he met with Presstek on June 17, 2004 the topic of a consent agreement had never been broached. Indeed, according to Lugli, he was unaware that he was required to sign a consent agreement. Perhaps the reason for this is that a Key Bank form of consent was MHR's (not Presstek's) idea and the record indicates that Presstek was aware that MHR's concern was simply funding until closing.

Moreover, notwithstanding Key Bank's initial posture, it clearly informed Presstek at 5:10 P.M. on June 22 that it consented to "the Proposed Transaction pursuant to the terms that have been outlined to" Key Bank and the letter was signed by Lugli. Presstek's general counsel (James Scafide) testified that after receiving Key Bank's June 22nd letter, he and Presstek's CFO spoke with Lugli by telephone and Lugli refused to sign the consent. Scafide insisted, however, that Lugli agree to an "unlimited amount" of funding notwithstanding that the Key Bank consent capped funding at closing to $26 million. Shortly afterward, Presstek terminated the agreement because Key Bank failed to sign the consent agreement.

One day after termination, Presstek had drafted a term sheet for a significantly cheaper purchase of ABD's assets under the new Asset Purchase Agreement. This new agreement was structured so that "[m]any liabilities [were] 'left behind' " (including, according to MHR, Presstek's obligations to MHR), and it was about $40 million less than the previous transaction. MHR also noted that Presstek negotiated the financially attractive new agreement with ABD for over three weeks with no written agreement from Key Bank regarding funding, suggesting that funding was not Presstek's concern.

Given ABD's dire financial condition, it went along with the less attractive deal. Under these circumstances, there are issues of fact as to whether Presstek's termination of the agreement was a mere ruse to pursue a more favorable deal (*see ADC Orange, Inc. v Coyote Acres, Inc.*, 7 NY3d 484, 491 [2006]). "[A] party to a contract cannot rely on the failure of another to perform a condition precedent where he has frustrated or prevented the occurrence of the condition" (*Kooleraire Serv. & Installation Corp. v Board of Educ. of City of N.Y.*, 28 NY2d 101, 106 [1971]).

Moreover, as noted above, the breach of contract claim was not barred or collaterally estopped by the Bankruptcy Court's final order. Pursuant to New York's transactional approach to the doctrine of res judicata, "once a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if based upon different theories or if seeking a different remedy" (*O'Brien v City of Syracuse*, 54 NY2d 353, 357 [1981]). "[A] claim will be barred by the prior adjudication of a different claim arising out of the same 'factual grouping' even if the claims 'involve materially different elements of proof' " (*Fifty CPW Tenants Corp. v Epstein*, 16 AD3d 292, 293 [2005] [citation omitted]), and even if the claims "would call for different measures of liability or different kinds of relief" (*Smith v Russell Sage Coll.*, 54 NY2d 185, 192 [1981] [citation omitted]).

Collateral estoppel, on the other hand, "requires 'that an issue in the present proceeding be identical to that necessarily decided in a prior proceeding, and that in the prior proceeding the party against whom preclusion is sought was accorded a full and fair opportunity to contest the issue' " (*Adam v Cutner & Rathkopf*, 238 AD2d 234, 242 [1997], quoting *Allied Chem. v Niagara Mohawk Power Corp.*, 72 NY2d 271, 276 [1988], *cert denied* 488 US 1005 [1989]; *see also Aryeh v Altman*, 36 AD3d 492 [2007] [collateral estoppel barred subsequent challenge to status of party as good faith purchaser where the issue had been raised in Bankruptcy Court in proceedings culminating in order approving reorganization plan]).

Here, neither res judicata nor collateral estoppel precludes MHR from pursuing its breach of contract claim against Presstek. First, viewing the facts in the light most favorable to the party opposing summary judgment (*People v Grasso*, 50 AD3d 535, 544 [2008]), the record indicates the Bankruptcy Court assigned that claim to MHR to pursue at a later date. In

fact, the Bankruptcy Court's order quotes the newly substituted language of the liquidation plan that

> "nothing herein or in the Confirmation Order shall constitute a waiver, release or otherwise negatively impact or impair any claim, right or cause of action that MHR or MHR Fund may hold against Presstek, Inc. and its subsidiaries, and affiliates, including its officers, directors, employees and legal and financial advisors."

Second, as indicated above, counsel for Presstek stated on the record several times that whether Presstek breached the Escrow and Stock Purchase Agreements was not currently before the court and that it was prepared to litigate that issue at a later date if and when MHR were to commence an action.

Third, and also very telling, is the fact that Presstek balked at the Bankruptcy Court's decision to assign the claim to MHR notwithstanding its earlier claim that it was prepared to litigate the issue at a later date. In an effort to have his cake and eat it too, counsel sought to convince the Bankruptcy Court that the elimination of the breach of contract claim was part of the consideration for the Asset Purchase Agreement that was approved by the court. The Bankruptcy Court apparently rejected Presstek's argument, however, because, as noted above, the written order expressly assigned the claim to MHR.

Fourth, and aside from the fact that the breach of contract claim was expressly relegated to a different forum in the future, res judicata is inapplicable here because the Bankruptcy Court never had jurisdiction over any claims between MHR and Presstek. Res judicata is inapplicable where a plaintiff is "unable to . . . seek a certain remedy or form of relief in the first action because of the limitations on the subject matter jurisdiction of the courts or restrictions on their authority to entertain" a certain form of relief (*Parker v Blauvelt Volunteer Fire Co.*, 93 NY2d 343, 349 [1999], quoting Restatement [Second] of Judgments § 26 [1] [c]). In other words, nondebtor MHR had no ability to assert its state-law contract claims against nondebtor Presstek before the Bankruptcy Court. "It is not sufficient that the putative 'related to' proceeding and a controversy involving the bankruptcy estate have common issues of fact"; a Bankruptcy Court has no jurisdiction over a contract between nondebtors (*In re 19 Ct. St. Assoc., LLC*, 190 BR 983, 996 [SD NY 1996]; *see also Newin Corp. v Hartford Acc. & Indem. Co.*, 37 NY2d 211 [1975]).

Indeed, the facts in this case are similar to those addressed by the Court in *Newin*. There, plaintiffs—the New York Stock Exchange (NYSE) and its subsidiary, Newin Corporation—sued two insurance companies alleging, inter alia, that the companies had engaged in fraudulent conduct that denied plaintiffs access to excess insurance coverage for losses resulting from the bankruptcy of Ira Haupt & Co., a NYSE member. The defendant insurance companies (collectively, Fidelity) moved to dismiss, contending, inter alia, that a settlement by the trustee in the bankruptcy proceeding—to which plaintiffs had objected—precluded any further litigation. The Court of Appeals affirmed the denial of Fidelity's motion and held:

> "*Res judicata* . . . need not long detain us. It is clear from even a cursory reading of the bankruptcy referee's opinion, that he made no finding as to the truth or falsity of plaintiffs' charges. He dealt only with the rights of the Haupt estate. The issues concerning the excess coverage bonds were not before him. *The question of whether Fidelity's conduct damaged plaintiffs by breach of any independent duties owed to them could not be litigated in that forum.* Unless the issues have 'necessarily been decided' in earlier proceedings, *res judicata* and collateral estoppel are unavailable as defenses to prevent their trial." (*Id.* at 216 [emphasis added and citations omitted].)

With respect to collateral estoppel, there was no identity of issues (*Ross v Medical Liab. Mut. Ins. Co.*, 75 NY2d 825 [1990]; *Matter of Halyalkar v Board of Regents of State of N.Y.*, 72 NY2d 261, 266 [1988]). The determination of the breach of contract issue was not necessary or essential to the decision to approve the Asset Purchase Agreement pursuant to 11 USC § 363 (b) and (m). If it had been, the Bankruptcy Court would not have assigned it to MHR. In any event, the District Court held that MHR's reading of *In re Abbotts Dairies of Pa., Inc.* (788 F2d 143 [3d Cir 1986]) was too broad, and that Presstek's alleged conduct with respect to the Stock Purchase Agreement and Escrow Agreement was not relevant to a section 363 (m) good faith determination. Thus, Presstek failed to establish its entitlement to summary judgment on res judicata and collateral estoppel grounds, and accordingly, its summary judgment motion should not have been granted.

Although not reached by the motion court, Presstek's other grounds for summary judgment were meritless. According to

Presstek, MHR had no standing to bring this action under the Stock Purchase Agreement as said agreement limited the number of parties that could claim benefit therefrom. The Stock Purchase Agreement, however, named certain third-party beneficiaries, including MHR, and placed no limits on contractual enforcement by parties to the other related agreements. The latter included the Distribution Agreement pursuant to which MHR consented to the Stock Purchase Agreement and waived many of its rights under certain notes for payment of cash and stock from Presstek. MHR thus had standing to bring this action.

Finally, Presstek argued that MHR failed to join ABD and Paragon as necessary and indispensable parties. However, both ABD and Paragon released their claims against Presstek in the bankruptcy proceeding and thus have no interest in the outcome of any claims between MHR and Presstek; consequently, they are not necessary parties under CPLR 1001 (a) (*see Matter of Castaways Motel v Schuyler*, 24 NY2d 120, 125 [1969]).

Accordingly, I would reverse the judgment appealed from.

ANDRIAS, J.P., and FRIEDMAN, J., concur with BUCKLEY, J.; CATTERSON and ACOSTA, JJ., dissent in part in a separate opinion by ACOSTA, J.

Judgment, Supreme Court, New York County, entered August 3, 2007, affirmed, without costs. Appeal from order, same court, entered July 26, 2007, dismissed, without costs, as subsumed in the appeal from the judgment.